**In re Ross M. STROBER and Marlene S. Strober, Debtors.**

**In re Gayle SUTTON, Debtor.**

**Bankruptcy Nos. 091–70586–21, 091–70089–21.**

United States Bankruptcy Court, E.D. New York.

March 10, 1992.

Bruce H. Kaplan, Melville, N.Y., for Ross & Marlene Strober.

Allan Mendelsohn, Zavatsky & Mendelsohn, Syosset, N.Y., for Dime Sav. Bank.

Marianne De Rosa, Mineola, N.Y., Chapter 13 Trustee.

Douglas T. Tabachnik, Gersten, Savage, Kaplowitz & Curtin, New York City, for Gayle Sutton.

Ronald M. Terenzi, Berkman, Henoch, Peterson & Peddy, Garden City, N.Y., for Citibank, N.A.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge.

These two cases raise the same issue: Can the holder of a mortgage on a Chapter 13 debtor's principal residence be forced to accept in full satisfaction of its mortgage pursuant to a Chapter 13 plan an amount substantially less than what is owed? Stated another way: Can a Chapter 13 plan "strip down" a creditor's mortgage on the debtor's residence to the current value of the residence when that value is less than the mortgage?

The precise issue raised by these two cases is now before the Court of Appeals for this Circuit in *In re Bellamy*, 122 B.R. 856 (Bankr.D.Conn.), *aff'd*, 132 B.R. 810 (D.Conn.1991), *appeal filed*. In *Bellamy*, the district court affirmed the bankruptcy court which permitted exactly what the Debtors seek to do here.

After the District Court decided *Bellamy*, the United States Supreme Court decided a closely related question; it held that a debtor in Chapter 7 may not " 'strip down' a creditor's lien on real property to the value of the collateral, as judicially determined, when that value is less than the amount of the claim secured by the lien." *Dewsnup v. Timm*, —— U.S. ——, 112 S.Ct. 773, 775, 116 L.Ed.2d 903 (1992). Although the Court deliberately refrained from deciding whether a debtor in Chapter 13 could do what the Court held could not be done in Chapter 7 [1], it is almost impossi-

---

**1.** The Court stated, "[h]ypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day." *Id.* 112 S.Ct. at 778. The Court expressed no opinion "as to whether the words 'allowed secure claim' have different meaning in other provisions of the Bankruptcy Code." *Id.*, at 778, n. 3.

ble to reconcile the decision's rationale with any different result in Chapter 13. Following *Dewsnup*, this Court holds that these Chapter 13 Debtors cannot cram down the mortgages on their principal residences in Chapter 13 and compel the mortgagees to accept the current market value of the residences in satisfaction of the mortgages.

In neither case is there any dispute as to the critical facts.

### The Strober Proceeding

Ross M. Strober and Marlene S. Strober filed a joint petition for relief under Chapter 13 on March 25, 1991. They have not yet confirmed a Chapter 13 plan. Preliminary to proposing a plan they filed the present motion described as made under 11 U.S.C. § 506(a) and (d).[2] They wish to modify their obligations to the Dime Savings Bank of New York, F.S.B., ("Dime") and Amalgamated Taxi Federal Credit Union ("Amalgamated") which both hold mortgages on their principal residence. Amalgamated has not appeared and is not opposing the motion. Dime has appeared to oppose the motion and has stipulated with the Debtors to the critical facts:

The value of the Strobers' principal residence when they filed was $167,500. Dime was owed $234,310.63 on a first mortgage and Amalgamated $32,946.43 on a second mortgage. Of the amount owed Dime, the outstanding principal was $177,855.21, the balance was arrears, escrow deficit and legal fees. The Strobers want the Amalga- mated mortgage classified as wholly unsecured and wiped out in its entirety. They want the claim of Dime bifurcated into a secured claim in the amount of $167,500 and an unsecured claim of $66,810.63.

The Debtors propose a variety of methods for paying off the bifurcated Dime mortgage but each one modifies Dime's rights under its mortgage by repaying a smaller amount than is now due and at a different interest rate or for a different period of time.[3] The Court has given no consideration to any of these alternatives because it holds that the Code does not permit a Chapter 13 plan to bifurcate and based on such bifurcation to modify a mortgage on a debtor's principal residence.

### The Sutton Proceeding

Gayle Sutton filed voluntarily under Chapter 13 on January 18, 1991. In her case no plan has as yet been confirmed because of the opposition of Citibank, N.A. ("Citibank") to her proposed cramdown of its mortgage. Her Chapter 13 proceeding involves facts similar to those in the *Strober* case except that the present proceeding represents the end of a long passage through the bankruptcy courts.

On July 18, 1985, Gayle Sutton and Harold Sutton, a co-borrower, gave Citibank a note in the principal sum of $250,000 secured by a mortgage of the same date on the premises at 15 Elizabeth Lane, Quogue, New York, which is Mrs. Sutton's principal

---

**2.** All references to statutory sections herein are to the Bankruptcy Code, unless otherwise noted.

**3.** Under one proposal, so much of Dime's mortgage as would be classified as unsecured, $66,810.63 ($234,310.63–$167,500) would be subtracted first from the unpaid interest then from the unpaid principal, leaving a principal balance due of $172,012.37 to be repaid outside the Debtors' Chapter 13 Plan over the remaining term of the mortgage at the interest rate called for by the mortgage. The unpaid late charges, legal fees and escrow deficit, totalling $13,598.99 now owing, would be paid under a Chapter 13 Plan. The allocation of the amount being crammed down first to interest, then to principal, follows the allocation called for by the mortgage for mortgage payments.

Alternatively, the $66,810.63 would be treated as "prepayment of principal." In that event the Debtors would pay the full amount of the present arrearages of $39,430.30 through the plan and repay the balance of the principal as reduced by the voided portion, over the remaining term of the mortgage.

Should the Court hold that 11 U.S.C. § 1325(a)(5) requires the payment of the full amount of the secured portion of the mortgage ($167,500) over the life of the plan, the Debtors propose paying that amount in equal monthly payments over a five year period. In recognition of the fact that a plan amortizing the mortgage over five years through equal monthly payments may not be feasible, because of tax claims taking priority which would have to be paid, the Debtors suggest a five year plan with a balloon payment of $159,898.40 at the end of the fifth year.

place of residence. At the time the market value of the premises was $350,000.

On August 1, 1986, Mrs. Sutton and Harold Sutton defaulted on the mortgage and ceased making payments. Citibank commenced a foreclosure action in the Supreme Court of the State of New York, Suffolk County, which was stayed when Harold Sutton filed a Chapter 7 petition on April 22, 1988 with the Bankruptcy Court for the District of New Jersey.

On November 17, 1988, Citibank obtained relief from the automatic stay and was permitted to proceed with its state foreclosure action. A judgment in favor of Citibank was entered on August 21, 1990 in the amount of $363,435.67, plus interest from January 31, 1990, together with additional costs, fees and disbursements. The foreclosure sale was scheduled to take place on February 27, 1991, but was stayed when Mrs. Sutton filed a Chapter 13 petition with this Court on January 18, 1991.

Citibank and the Debtor have agreed to the following amounts as of the filing date: The unpaid principal balance due totaled $243,949.78; the arrears totalled $198,526.72.

According to Citibank, as of November 26, 1991, the amount necessary to pay off Citibank's loan totalled $414,869.65, consisting of $237,865.71 principal; $124,969.30 interest; $38,769.02 escrow overdraft; $4,422.62 late charges; and $8,843 in legal fees and disbursements.

Citibank does not dispute the Debtor's contention that the mortgaged property is now worth only $350,000. It is the Debtor's position that Citibank's claim is secured only up to this amount and she claims the right under Section 506(a) to bifurcate Citibank's claim into secured and unsecured segments. What she proposes is to continue paying off the principal amount of the mortgage according to the original terms of the note and to deem unsecured so much of Citibank's claim as exceeds $350,000. The difference between the unpaid principal balance and $350,000 is to be paid back under the Chapter 13 plan over 60 months.

Citibank not only opposes bifurcation but claims that even if bifurcation were allowed, the full amount of the default must be cured under the Chapter 13 plan. Citibank contends that the Debtor must pay the sum of $198,526.72, the amount of the pre-petition arrears, during the term of the plan plus interest thereon, as well as maintain regular payments under the outstanding note according to its terms.

## DISCUSSION

■ What is involved is an issue of statutory construction: does the Bankruptcy Code permit a Chapter 13 plan to modify the rights of a mortgagee holding a mortgage on the debtor's principal residence notwithstanding 11 U.S.C. § 1322(b)(2)? 11 U.S.C. § 1322 sets forth what a Chapter 13 plan must contain, what it may contain and the maximum term it can run. Section 1322(b)(2) permits a plan to "modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence ...*" (emphasis added).[4]

Despite the exclusion of home mortgages from the power of Chapter 13 debtors to modify their secured obligations, many courts, including three Courts of Appeals, have held that a Chapter 13 plan may, nevertheless, strip down a home mortgage to the value of the collateral. *In re Hart*, 923 F.2d 1410 (10th Cir.1991); *Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123 (3rd Cir.1990); *In re Hougland*, 886 F.2d 1182 (9th Cir.1989).[5] *In re Harris*, 94

---

**4.** 11 U.S.C. § 1322(b)(2) reads:

(b) Subject to subsections (a) and (c) of this section, the plan may—
(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders

of unsecured claims, or leave unaffected the rights of holders of any class of claims; ...

**5.** The *Wilson* and *Hart* courts also base their decision in part on factual findings that the loans in questions were secured by property other than the debtor's principal residence and, therefore, were not eligible for Section 1322(b) protection.

B.R. 832 (D.N.J.1989); *In re Wright*, 128 B.R. 838 (Bankr.N.D.Ga.1991); *In re Loader*, 128 B.R. 13 (Bankr.D.Mass.1991); *Goins v. Diamond Mortgage Corp.*, 119 B.R. 156 (Bankr.N.D.Ill.1990); *In re McNair*, 115 B.R. 520 (Bankr.E.D.Va.1990); *In re Gadson*, 114 B.R. 453 (Bankr.E.D.Va. 1990); *In re Brouse*, 110 B.R. 539 (Bankr. D.Colo.1990); *In re Demoff*, 109 B.R. 902 (Bankr.N.D.Ind.1989).

The courts that have adopted the position espoused by the Debtors here, that Section 1322(b)(2) does not necessarily prohibit modification of a residential mortgage in Chapter 13, have found their authority in Section 506. Section 506 is part of Chapter 5, applicable to all the chapters of the Bankruptcy Code, including Chapter 13. 11 U.S.C. § 103(a). Subsection (a) of Section 506 divides an "allowed claim of a creditor secured by a lien on property in which the estate has an interest" into secured and unsecured portions. Subsection (d) of Section 506 voids, with some exceptions, any lien "that is not an allowed secured claim".[6]

Speaking generally, the courts sanctioning the modification in Chapter 13 of a residential mortgage have read Section 506 as limiting the prohibition in Section 1322(b)(2) against modification of a "claim secured *only* by a security interest in real property" to the portion of the claim which Section 506(a) describes as "secured." These courts bifurcate the mortgage into two parts, a secured portion and an unsecured portion. The secured portion is "the value of such creditor's interest in the estate's interest in such property." Only

that portion, these courts say, is protected from modification under Section 1322(b)(2).

Courts reaching a different result refuse to read Section 506 as qualifying Section 1322(b)(2). *In re Nobelman*, 129 B.R. 98 (N.D.Tex.1991); *In re Russell*, 93 B.R. 703 (D.N.D.1988); *In re Hussman*, 133 B.R. 490 (Bankr.D.Minn.1991); *In re Etchin*, 128 B.R. 662 (Bankr.W.D.Wis.1991); *In re Mitchell*, 125 B.R. 5 (Bankr.D.N.H.1991); *In re Chavez*, 117 B.R. 733 (Bankr.S.D.Fla. 1990); *In re Sauber*, 115 B.R. 197 (Bankr. D.Minn.1990); *In re Schum*, 112 B.R. 159 (Bankr.N.D.Tex.1990). *Cf.*, *Landmark Fin. Serv. v. Hall*, 918 F.2d 1150 (4th Cir. 1990); *In re Terry*, 780 F.2d 894 (11th Cir.1985); *Grubbs v. Houston First Am. Sav. Ass'n.*, 730 F.2d 236 (5th Cir.1984);

The authority of the decisions which have read Section 506 as limiting the protection given home mortgages by Section 1322(b)(2) against cramdown has been weakened, if not demolished, by *Dewsnup*, even though *Dewsnup* primarily focused on subsection (d) of Section 506, not on subsection (a). Just as Section 506 has supplied the justification for lien stripping in Chapter 13 so was it the keystone of the debtor's argument in *Dewsnup*. The debtors there took the position that Section 506(a) and 506(d) are complementary and are to be read together, that Section 506(a) bifurcates classes of claims allowed under Section 502 into secured claims and unsecured claims, and that any portion of an allowed claim deemed to be unsecured under Section 506(a) was not "an allowed secured claim" and thus fell within the lien voiding scope of Section 506(d).

**6.** 11 U.S.C. § 506. Determination of secured status.

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed

disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

\* \* \* \* \* \*

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void unless—

(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

The Supreme Court held that notwithstanding Section 506(a), Chapter 7 debtors could not "strip down" a mortgage to the value of the collateral securing it because the mortgagee's "claim is *secured by a lien* and has been fully allowed pursuant to § 502." *Dewsnup*, 112 S.Ct. at 778 (emphasis supplied). As Justice Scalia's dissent points up, the majority held that (for purposes of § 506(d)) a secured claim "simply connotes an allowed claim that is 'secured' in the ordinary sense, i.e., that is backed up by a security interest in property, whether or not the value of the property suffices to cover the claim." *Id.* at 781.

Among the reasons given by the majority for its decision was that if the debtor were allowed to strip down the creditor's lien to the value of the collateral, the creditor would lose the benefit of any increase in the value of the property before foreclosure sale, though what the mortgagor and mortgagee had bargained for was having the creditor's lien stay with the property until foreclosure. *Id.* at 778.

In the view of the Supreme Court, the language of the Code was ambiguous. Given that ambiguity, the Court refused "to attribute to Congress the intention to grant a debtor the broad new remedy against allowed claims to the extent that they become 'unsecured' for purposes of § 506(a) without the new remedy's being mentioned somewhere in the Code itself or in the annals of Congress." To do so, the Court said "is not plausible ... and is contrary to basic bankruptcy principles." *Id.* at 779.

There is much less warrant for attributing an intention to Congress to allow liens to be avoided in Chapter 13 "to the extent that they become 'unsecured' for purposes of § 506(a)" when Chapter 13 contains an explicit prohibition against modification of "a claim secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). The annals of Congress reveal that this explicit prohibition was deliberately crafted to block a debtor from voiding the mortgage on his home to the extent it becomes "unsecured."

Turning from *Dewsnup* to the recognized guides to statutory construction—the language of the statute, its legislative history and its over-all design—the Court is persuaded that all of these compel rejection of a construction which would deny Section 1322(b)(2) its plain meaning.

### The Statutory Language

■ Statutory interpretation begins with the language of the statute itself. *Pennsylvania Dep't. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). The natural and obvious meaning of a "claim secured only by a security interest in real property that is the debtor's principal residence" is a claim for which the only security held by the lender is a home mortgage.

It is self-evident that such a claim—a claim secured only by a home mortgage—could be both a secured claim and an unsecured within the meaning of Section 506(a). But Section 1322(b) speaks simply of a claim "secured *only* by" a mortgage. It does not use the term "secured claim." If the claim is secured only by the debtor's principal residence then the rights of the holder of that claim may not be modified. The restriction on modification is not limited to so much of the claim as is secured, but extends to the entire claim, secured or unsecured, provided that the security consists only of a security interest in the debtor's principal residence.

Those who would read the protection of Section 1322(b)(2) as limited to the secured portion of a home mortgage confuse the term "secured claim" with the phrase "claim secured only" by a home mortgage and disregard the difference in the function of the word "secured" in the two phrases. In the phrase "secured claim," the word "secured" is an adjective modifying "claim," so that the entire phrase can legitimately be read as meaning a *wholly* secured claim. In the latter phrase, "a claim secured only by", the phrase "secured *only by*" performs an adverbial function describing a characteristic of the claim, i.e., that it is secured only by a residential mortgage. That a claim is "secured *only*

*by"* a residential mortgage does not mean that it is necessarily a "secured claim." Even if the mortgage exceeds the value of the residence so that the claim is not a secured claim, in the sense of wholly secured, it is still correctly described (if the creditor holds no other security) as "secured only by" a residential mortgage.

Indeed, Section 506(a) itself distinguishes between a claim "secured by a lien on property" and a "secured claim." Section 506(a) declares that an "allowed claim of *a creditor secured by* a lien on property ... is *a secured claim* to the extent of the value of such creditor's interest in the estate's interest in such property." Thus, the "claim of a creditor secured by a lien on property" is not necessarily a "secured claim." Whether it is or not will depend on the value of the creditor's interest in the estate's interest in the property. But whether or not the claim is a "secured claim", it is still a "claim ... secured by a lien on property."

*Dewsnup* demonstrates that a claim may properly be described as a "secured claim" even where it exceeds the value of the collateral securing it.

### The Legislative History

■ The legislative history reinforces the meaning which any layman would give Section 1322(b)(2). The section represents a compromise between the Senate and the House, reached after the responsible Senate subcommittee had heard testimony from a representative of the mortgage banking industry deploring lien stripping (which the courts had recently sanctioned under Chapter XII of this Code's predecessor) and expressing serious apprehension about the effect of lien stripping, if permitted in Chapter 13, on the availability of home mortgage money. In fact, were there any ambiguity in the language of Section 1322(b)(2), the legislative history of that section should dispel any question that Congress intended to prohibit the use of Chapter 13 to strip down residential mortgages.

Under Chapter XIII of the Bankruptcy Act of 1898, the statutory predecessor of Chapter 13, an individual wage earner's reorganization plan could not "deal with" (i.e. modify or otherwise affect) the rights of *any creditor* holding a claim secured by real property. This was so because of the express exclusion in Chapter XIII of "claims secured by estates in real property or chattels real" from the definition of "claims". Bankruptcy Act of 1898, § 1006(1), *repealed by* Pub.L. No. 95–598, § 401, 92 Stat. 2549. One possible reason for such exclusion was the existence of Chapter XII, which was concerned with real property arrangements. The result was "[j]udicial attempts to circumvent the rigid rules regarding the treatment of secured claims in Chapter XIII" which "often failed." *In re Kaczmarczyk,* 107 B.R. 200, 202–203 (Bankr.Neb.1989) (citations omitted).

Acting on the recommendations of the Bankruptcy Commission, the House proposed to eliminate this "rigid rule" completely by setting no limits on the ability of an individual wage earner to modify secured claims, equally with unsecured claims, through a Chapter 13 plan. Section 1322(b)(2) of the proposed House Bill read: "Subject to subsections (a) and (c) of this section, the plan may ... modify the rights of holders of secured claims or of holders of unsecured claims." H.R. 8200, 95th Cong., 1st Sess. (1977).

By contrast, the Senate carved out real estate mortgages from the broad authority the House would have given debtors to modify secured claims. The Senate's version of Section 1322(b)(2) (as reported on May 17, 1978) read: "Subject to subsections (a) and (c) of this section, the plan may ... modify the rights of holders of secured claims (*other than claims wholly secured by mortgages on real property*) or of holders of unsecured claims." S.2266, 95th Cong., 1st Sess. (1977) (emphasis added).

During the 95th Congress hearings were held by the Subcommittee on Improvements of the Judicial Machinery of the Senate Committee on the Judiciary on both the Senate and the House bills. One of the witnesses testifying before the Subcommit-

tee was Edward J. Kulik, Senior Vice President of the Real Estate Division of the Massachusetts Mutual Life Insurance Company. He appeared on behalf of various mortgage lenders to express their concern regarding the cramming down of real estate claims to the value of the properties securing them, just sanctioned in a case arising under Chapter XII. *In re Pine Gate Assoc., Ltd.,* 2 Bankr.Ct.Dec. (CRR) 1478 (N.D.Ga.1976). In *Pine Gate,* as Mr. Kulik said, the " 'value' of the nonassenting secured creditor's debt was found to be the appraised value of the security, at a time of substantially depressed real estate market conditions." Hearings Before the Subcommittee on Improvements of the Judicial Machinery of the Senate Committee on the Judiciary, 95th Cong., 1st Sess. 709 (1977) (statement of Edward J. Kulik). He pointed out that

> When a plan is "crammed-down" in such a manner ... the secured creditor is paid only the depressed "appraised value" of the property—even though it is substantially less than the principal balance of the debt—[and] the secured creditor loses any possibility of recovering the full debt if the real estate market returns to more normal conditions.

*Id.* at 709.

He said that the "pervasive threat of bankruptcy proceedings has had a serious adverse impact on the real estate lending community" and that "[u]nless this situation is changed, the flow of funds into new mortgages will be greatly reduced." *Id.*

Mr. Kulik then turned to the proposed provisions of Chapter 13 of the Bankruptcy Code. He said that both bills included two significant changes, compared to existing law, that might have the unintended effect of reducing the flow of home mortgage money. One of the two changes was the permitted modification of mortgage debt that forced cramdown of a mortgage debt. He emphasized that allowing the cramdown of residential mortgage debt may cause "residential mortgage lenders to be extraordinarily conservative in making loans in cases where the general financial resources of the individual borrower are not

particularly strong." *Id.* at 714. He urged that both bills should be modified so that a mortgage on real property *"other than investment property may not be modified." Id.* at 714 (emphasis added).

Senator DeConcini, Chair of the Joint Committee, then queried Mr. Kulik closely with respect to his testimony, expressing some skepticism about the serious impact on home mortgage financing foreseen by Mr. Kulik from the changes in the law being made by Chapter 13. At this point, Mr. Robert E. O'Malley of the firm of Covington & Burling, who was accompanying Mr. Kulik, interposed:

> With respect to the savings and loans, in particular, and the future prospects for loans to individuals under the proposed bills, there is really only one basic problem. That is, the provision in both bills that provides for *modification of the rights of the secured creditor on residential mortgages,* a provision that is not contained in present law.
>
> I think the answer to your question is that, of course, savings and loans will continue to make loans to individual homeowners, but they will tend to be, I believe, extraordinarily conservative and more conservative than they are now in the flow of credit.
>
> It seems to me they will have to recognize that there is an additional business risk presented by either or both of these two bills if the Congress enacts chapter XIII [sic] in the form proposed, thus providing for the possibility of modification of the rights of the secured creditor in the residential mortgage area.
>
> I think the answer is that they will be much more conservative than they have been in the past.

*Id.* at 715 (emphasis added).

The language which eventually emerged following the testimony of Mr. Kulik and Mr. O'Malley reflects their concerns. The present language, rather than excluding all liens on real property from modification, as had the Senate bill, only excludes from modification a mortgage on the debtor's principal residence. Also the requirement that the claim be *"wholly* secured by [a]

mortgage" to be exempt from modification is replaced by the requirement that it be a claim "secured *only* by a security interest in real property." (Emphasis added). The substitution of the word "only" for the word "wholly" (the significance of which some opinions have minimized), reflects more clearly than most language changes, the legislative intent. Because the attention of the statute's draftsmen had been explicitly drawn to the *Pine Gate* case where a cramdown of a real estate mortgage had taken place, they necessarily had to be sensitive to the difference between a mortgage which is *wholly* secured, i.e., one which equals or exceeds the value of the mortgaged property and one which is *only* secured by such property, meaning the lender has no protection other than the mortgage. Therefore, when they changed the language of the exclusion it must have been with the intention of eliminating the requirement that the mortgage be *wholly* secured in order to qualify for exemption from modification. There would have been no purpose in the change from "wholly" to "only" had the Code's draftsmen considered Section 506(a) as allowing the modification of a mortgage to the extent that it was not a wholly secured mortgage, even though it was the creditor's only security.

The legislative history indicates that the statute was drafted to avoid any adverse impact on the flow of mortgage money to individual home owners and it should be interpreted to carry out that legislative purpose.

### The Statutory Scheme

The overall structure and many of the provisions of Chapter 13 are incompatible with the total restructuring of long term debt based on shifts in the real estate market through the use of Section 1322(b), and requires rejection of the construction urged by the Debtors.

Chapter 13 was explicitly designed for the small wage earner, or businessman, to enable him to avoid liquidation by paying off his debts over a period of time. In no event may that period exceed five years. 11 U.S.C. § 1322(c). To be eligible for

Chapter 13 relief, an individual's unsecured debts must be less than $100,000 and his secured debts less than $350,000. 11 U.S.C. § 109(e).

In recognition of the fact that such an individual's debts are likely to include his home mortgage and arrears on that mortgage, and that the terms of most mortgages exceed five years, Congress, even as it was excluding home mortgages from modification in Section 1322(b)(2) provided in Section 1322(b)(5) a method by which homeowners could take care of their mortgage debt in Chapter 13. In the explanation given Congress of Section 1322(b)(2) and of the exclusion from modification of home mortgages, it was pointed out that home mortgages were taken care of by Section 1322(b)(5). 124 Cong.Rec. H11106 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec. S17406, 17424 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini). *See, In re Colegrove*, 771 F.2d 119, 125 (6th Cir.1985) (Celebrezze, J., dissenting) ("Congress in enacting Sections 1322(b)(2) & (b)(5) intended to treat security interests in principal residences different from all other claims").

Section 1322(b)(5) permits a plan to "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." Section 1322(b)(5) begins: "notwithstanding paragraph (2) of this subsection." That is, notwithstanding the exclusion from modification of claims secured only by a home mortgage, a debtor may cure arrears under a Chapter 13 plan.

In *In re Taddeo*, 685 F.2d 24, 27–28 (2d Cir.1982), the Court of Appeals for this Circuit held the "notwithstanding clause" to be unnecessary because of the clear distinction "between modifying a claim (by reducing payments due thereon) and curing a default (and maintaining those payments)." But while the "notwithstanding" clause may be legislative overkill when a plan conforms to § 1322(b)(5), its presence underlines the fact that a plan affecting

"any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due" is subject to the limitations imposed by Section 1322(b)(2) on the modification of mortgage debt. It is worth noting that Section 1322(b)(5) calls for the maintenance of payments while the case is pending on *unsecured* claims, equally with secured claims, provided that the last payment on the claim is due after the plan is completed.

But plans based on bifurcation, like the two which form the subject of this Opinion, do not follow Section 1322(b)(5)'s blueprint. Neither provides for the total curing of the existing default. The Debtors in both cases provide for the cure of any default only to the extent that such default, together with the unpaid principal, does not exceed the present value of the Debtor's residence. Any excess is ignored.

Not only do the Debtors here involved fail to bring themselves within Section 1322(b)(5), but the same will probably be true of all plans based on bifurcation. Bifurcation, therefore, cannot claim the protection given by Section 1322(b)(5), "notwithstanding" Section 1322(b)(2).

A Chapter 13 plan that meets the requirements of Section 1322(b)(5) escapes successful challenge under Section 1325(a)(5) because "cure under § 1322(b)(5) is not a modification of the mortgagee's rights." *Landmark Fin. Serv. v. Hall*, 918 F.2d 1150, 1154 (4th Cir.1990), *citing* 5 Collier on Bankruptcy, ¶ 1322.09[4] (15th ed. 1986). But the same is not true of a plan predicated on bifurcation. Section 1325(a)(5) requires that "with respect to each allowed secured claim provided for by the plan" one of three conditions must be met: (1) if the holder of the claim does not accept the plan or (2) the debtor does not surrender the property securing such claim

to the holder, then (3) the plan must provide that the holder of such claim "retain[s] the lien securing such claim" and "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim [must be] not less than the allowed amount of such claim." This means that if the mortgagee's claim were bifurcated and the mortgagee refused to accept the Chapter 13 plan, then if the debtor wished to retain his home, he would have to distribute under the plan to the mortgagee not less than the allowed amount of the secured portion of the bifurcated claim. *See, Landmark,* at 1154. The allowed amount of the secured portion, if bifurcated, would be the mortgage debt up to the current value of the debtor's residence. Since a plan may not last more than five years, that amount would have to be paid off during that period of time.[7] The Strobers suggest that they are ready to meet the requirements of Section 1325(a)(5) by a balloon payment in the fourth year, but whether such a plan would qualify for confirmation as feasible[8] is most dubious. Like the Strobers, few debtors would have the capacity to pay off their entire mortgage, within a five year period, through regular monthly payments, even when reduced by bifurcation to the present value of the debtor's residence.

Section 1325(a)(5) is so at odds with bifurcation that the *Bellamy* court, after sanctioning bifurcation, refused to apply Section 1325(a)(5) to the secured portion, saying that to do so "would essentially nullify the use of § 506(a) in chapter 13 cases." *In re Bellamy,* 126 B.R. 134, 136 n. 3 (D.Conn.1991). This is a Procrustean approach to statutory construction. Not only is the plain explicit language of Section 1322(b) ignored in favor of the general language of Section 506(a), but Section 1325(a)(5) is excised. The fact that compliance with Section 1325(a)(5) is incompatible

---

7. It is unnecessary at this time to consider what interest, if any, would have to be paid on this amount to make the payments equal to present value. "In a cramdown, the debtor can effectively reduce the contract rate of interest or extend the maturity date of the loan, as long as the value of the secured claim, discounted to present value, is paid." *Landmark,* at 1154, n. 4.

*See also, In re Jordan,* 130 B.R. 185 (Bankr. D.N.J.1991).

8. Section 1325(a) provides that a court shall confirm a plan if, *inter alia,* the debtor will be able to make all payments under the plan and to comply with the plan. 11 U.S.C. § 1325(a)(6).

with bifurcating a residential mortgage into secured and unsecured segments argues against reading Section 506(a) as compelling that result, rather than for disregarding Section 1325(a)(5).

In several other respects, the Code fits bifurcation badly. Thus, Section 1328(a) excepts from the discharge of all debts upon the completion of a plan "any debt— (1) provided for under section 1322(b)(5)" and Section 1328(b) excepts from a hardship discharge of all unsecured debts "any debt—provided for under section 1322(b)(5)." The obvious purpose is to except long term debt not satisfied under a five year plan from discharge. But how does that fit in with plans, like those of the Debtors here, that are not covered by Section 1322(b)(5) yet purport to affect long term debt by reducing the amount the mortgagee will ultimately receive? Are such long term debts to be discharged whereas debts covered by a plan that satisfies Section 1322(b)(5) are not? The lack of another exception to the general discharge rule of Section 1328(a) is further evidence that Congress did not envisage modifications of long term debt. *In re Hildebran*, 54 B.R. 585, 587 (Bankr.D.Ore.1985).

Also incompatible with restructuring long term debt as advocated by the proponents of bifurcation is the relatively brief term a Chapter 13 plan is intended to last. No plan may be approved for a period longer than five years and cannot exceed even three years unless the Court, for cause, approves a longer period. 11 U.S.C. § 1322(c). *In re Scott*, 121 B.R. 605 (Bankr.E.D.Okla.1990); *In re Ramirez*, 62 B.R. 668 (Bankr.S.D.Cal.1986). Relatively short term plans could not have been conceived as a vehicle for radical alteration of long term debt.

What happens if bifurcation is allowed when a debtor exercises his absolute right to dismiss his Chapter 13 proceeding or convert it to Chapter 7? *See*, 11 U.S.C. § 1307(a), (b). If there is no bifurcation, neither secured nor unsecured creditors are adversely affected by dismissal or conversion. But what if the Chapter 13 debtor is allowed to do what the Supreme Court has decided may not be done in Chapter 7, what if he reduces the mortgage on his home to the value of the property? What happens to the mortgage when the debtor dismisses or converts? Does it go back to its prior figure? Does it make any difference if the debtor dismisses at the end of one month? Two years? Four years?

What happens when a Chapter 13 debtor falls behind on his payments under a plan—as a large percentage do—and the mortgagee is given relief from the Section 362 stay and forecloses? Is the mortgagee entitled to recover only the judicially determined value of his collateral or the entire unpaid mortgage debt? Why should the debtor in Chapter 13 receive the benefit of "any increase upon the judicially determined value" prior to foreclosure and not the debtor in Chapter 7, even though prior to bankruptcy what was bargained for before the debtor elected Chapter 13 over Chapter 7 was "that the creditor's lien stays with the real property until the foreclosure"? *Dewsnup*, 112 S.Ct. at 778.

One more instance of the Code's incompatibility with bifurcation is the carefully tailored and limited power given a debtor to avoid judicial liens that impair his exemption. 11 U.S.C. § 522(f)(1). The Debtors here are not claiming the right simply to protect a state homestead exemption ($10,000 or $20,000 in New York), but the right to avoid any lien in excess of the present market value of their home and they are not confining their lien avoiding power to judicial liens but claiming it as to all liens, including consensual liens. Why should Congress have been so careful to spell out the lien avoiding power in Section 522(f)(1) if Section 506(a) gives debtors such broad powers to avoid mortgage debt?

### Effects

If bifurcation were clearly mandated, then its effects would not be the business of the courts, but since even those urging bifurcation would have to admit ambiguity, the result of what they propose is relevant to legislative intention. Congress cannot be presumed to have intended consequences at odds with sound policy.

In the present real estate market, adoption of the Debtors' position would bring about exactly the consequences of which Congress was warned when it drafted the Code. If by filing under Chapter 13 debtors were permitted to write down to present value their outstanding mortgages, mortgage lenders would be adversely affected, drying up, inevitably, new sources of mortgage money.

Moreover, if in the present depressed market anyone with a mortgage can rewrite it down to his home's present value merely by filing a petition under Chapter 13, the real estate portfolio of banks and other lending institutions will be subjected to enormous, perhaps unbearable strain. Heavy mortgage writedowns will be available for $120, the price of filing a petition under Chapter 13, since anyone can file. No prerequisites need be met other than debts may not exceed certain limits. Lenders that are already in a precarious financial position may be pushed towards collapse.

For debtors, too, the result of sanctioning bifurcation could be most undesirable. Permitting debtors to modify their mortgage obligations may have the unintended result of forcing lenders to oppose Chapter 13 plans and to opt for foreclosure. At the present time creditors have no reason to, and no grounds for, seeking relief from the automatic stay where arrears are being cured and current mortgage payments are being made as called for by most Chapter 13 plans. The same will not be true, however, if less is being paid. In that event, lenders may deem it in their interest to seek relief from stay so that they can repossess the property and take advantage of any future increase in real estate values.

In sum, the only construction of the Code which is consistent with the plain language of Section 1322(b)(2), with the legislative history of Section 1322(b)(2), and with the structure and purpose of Chapter 13 as a whole precludes the modification in a Chapter 13 plan of a mortgage on the debtor's principal residence when it constitutes the creditor's only security.

One issue remains in the *Strober* case, should an appellate court disagree with this Court's decision of the central issue. To be eligible for relief under Chapter 13, a debtor's unsecured debt must be less than $100,000. 11 U.S.C. § 109(e). If the two mortgages on the Strobers' home, to the extent they exceed the value of that home, can be treated as unsecured debt, the Debtors' unsecured debt vastly exceeds $100,000 making them ineligible for Chapter 13.

The cases are not in agreement as to whether the bankruptcy court, in passing on Chapter 13 eligibility, can look behind the face amounts shown on the debtor's schedules. Dime says that accepting the Strobers' premise that their mortgage can be bifurcated, their Chapter 13 petition must be dismissed as a matter of law. Dime cites *In re Magras*, 129 B.R. 429 (Bankr.D.V.I.1991). The Strobers counter with *In re Morton*, 43 B.R. 215 (Bankr. E.D.N.Y.1984) in which the court held the schedules to be dispositive.

Although the question is not free from doubt, this Court tends to agree with Dime that the financial limits imposed on the use of Chapter 13 must be respected even if not immediately apparent from the Debtors' schedules. Accordingly, if the bifurcation urged by the Strobers were allowed, this Court would dismiss the Strobers' Chapter 13 petition on the grounds that they are ineligible for Chapter 13 relief because their unsecured debts exceed $100,000.

However, because this Court is of the view, for the reasons given, that bifurcation for the purposes of modifying a mortgage on a principal residence is unavailable, Dime's and Amalgamated's claims are secured claims and must be counted as such. Therefore, this case will not be dismissed because of the Debtors' ineligibility. But since it is self-evident that no plan can be confirmed by Mr. and Mrs. Strober unless the bifurcation is permitted, dismissal is inevitable. For the present, all the Court is doing, however, is denying the Debtors' motion.

As for the *Sutton* case, the Court at the present time is denying confirmation to

Mrs. Sutton's Chapter 13 plan. Her Chapter 13 proceeding remains pending, leaving her free to file another plan which may, under the views expressed in this Opinion, qualify for confirmation.

## CONCLUSIONS OF LAW

The motion made by Mr. and Mrs. Strober and the objections to confirmation of Mrs. Sutton's plan raised by Citibank are core proceedings of which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2)(A), (B) and (L) and 28 U.S.C. § 1334(b).

Section 506(a) and (d) do not authorize Mr. and Mrs. Strober to confirm a plan predicated on the bifurcation of the mortgage held by Dime and the voiding of the mortgage held by Amalgamated.

The objections of Citibank to Mrs. Sutton's plan are sustained. Her plan cannot be confirmed in the light of those objections. Her plan does not satisfy the requirements of the Code and violates Section 1322(b)(2).

Settle Orders in accordance with this Opinion.